ORIGINAL

1  KENNETH J. NOLAN, Esq. (FL SBN 603406)
   MARCELLA AUERBACH, Esq. (FL SBN 249335)
2  JOSEPH E.B. WHITE, Esq. (PA SBN 203475)
   MATTHEW B. PAVONE, Esq. (CA SBN 95964)
3  NOLAN & AUERBACH, P.A.
4  435 North Andrews Avenue, Suite 401
   Fort Lauderdale, FL 33301
5  (954) 779 3943
6  (954) 779-3937 (fax)

7  Courtyard Square
   750 Grant Avenue, Suite 250
8  Novato, CA 94945
9  (415) 209-9610
   (415) 892-0337 (fax)

10 Attorneys for Plaintiff Brian Shields
11

SEALED
BY COURT ORDER

**FILED**

FEB 2 2 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

12          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
13                  SAN FRANCISCO DIVISION

MEJ

14  UNITED STATES OF AMERICA; AND        )
    THE STATES OF CALIFORNIA, COLORADO,   )   CV11   0822
15  CONNECTICUT, DELAWARE, FLORIDA,       )
16  GEORGIA, HAWAII, ILLINOIS, INDIANA,   )   CIVIL ACTION NO.:_____
    LOUISIANA, MARYLAND, MICHIGAN,        )
17  MINNESOTA, NEVADA, NEW HAMPSHIRE,     )
    NEW JERSEY, NEW MEXICO, NEW YORK,     )
18  NORTH CAROLINA, OKLAHOMA,             )
19  RHODE ISLAND, TENNESSEE, TEXAS,       )
    WISCONSIN, THE COMMONWEALTHS OF       )
20  MASSACHUSETTS AND VIRGINIA; and       )   **FILED UNDER SEAL**
    THE DISTRICT OF COLUMBIA;             )   PURSUANT TO
21                                        )   31 U.S.C. § 3730(b)(2)
22  *ex rel.* BRIAN SHIELDS               )
                                          )
23           Plaintiffs and Relators,     )   **FALSE CLAIMS ACT COMPLAINT**
    v.                                    )
24                                        )
25  GENENTECH, INC.;                      )
    OSI PHARMACEUTICALS, INC.;            )
26  and NOVARTIS PHARMACEUTICALS          )   By Fax
    CORPORATION                           )
27           Defendants.                  )
                                          /
28  _____

FALSE CLAIMS ACT COMPLAINT
1

1.     Brian Shields ("Relator") brings this action on behalf of the United States of America against Genentech, Inc., OSI Pharmaceuticals, Inc. and Novartis Pharmaceuticals Corporation for treble damages and civil penalties arising from conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA").

2.     This action is also brought under the respective *qui tam* provisions of False Claims Acts (or similarly named) on behalf of the of the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Wisconsin, the District of Columbia, the Commonwealths of Massachusetts and Virginia. These states, together with the United States, are hereafter collectively referred to as the Government.

3.     The violations arise out of false claims made to Medicare, Medicaid, TRICARE, and other federally-funded government healthcare programs (hereinafter referred to as "Government Healthcare Programs") caused by the Defendants.

4.     This Complaint describes a systematic course of conduct by Defendants (as specified herein) to unlawfully promote several prescription drugs: Defendants Genentech and OSI promoted Tarceva for first-line off-label use in two patient populations with advanced NSCLC: (1) patients who had never smoked (Never Smokers); and (2) females with adenocarcinoma. Tarceva would have had only modest sales but for the off-label promotion. Defendants also promoted Tarceva off-label for maintenance treatment well prior to its FDA approval for such use in 2010. Defendants Genentech and Novartis unlawfully promoted Xolair off-label for the entire allergic cascade.

5.      Much of the off-label prescribing, and some of the on-label prescribing, was fueled by the provision of kickbacks to health care providers. These include but are not limited to phony and /or excessive payments to health care providers for advisory boards, speaking fees, and for Defendant OSI, further provided excessive and/or phony payments to physicians for phase IV clinical trials. Moreover, for these and every other drug sold by Defendant Genentech, adverse events reported by patients, otherwise required to be reported to the U.S. Food and Drug Administration (FDA), were intentionally not reported to the FDA by Defendant Genentech.

## INFORMATION ABOUT THE RELATOR AND THE DEFENDANTS

6.      Relator Brian Shields is a resident of the State of California, and has been an employee of Defendant Genentech since 2007.

7.      Relator brings this action based on his direct knowledge, and also on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4).  Notwithstanding same, Relator is an original source of the facts alleged in this Complaint.

8.      Relator is informed and believes that the pervasive kickbacks and false claims described herein are ongoing, and date back at least six years.

9.      Defendant Genentech, Inc., is a corporation organized under the laws of the State of Delaware, having a principal place of business at 1 DNA Way, South San Francisco, California. Genentech manufactures and markets multiple products for cancer, and other diseases and conditions throughout the United States.

10.     Defendant OSI Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Melville, New York. In 2010, it became a wholly owned subsidiary of Astellas U.S. Holding Inc., a holding company owned by Astellas Pharma Inc.

11.     Defendant Novartis Pharmaceuticals Corporation, is a Delaware corporation with headquarters in East Hanover, New Jersey. Novartis is a wholly-owned subsidiary of Novartis Pharma AG.

12.     At all times relevant hereto, Defendants acted through its agents and employees, and the acts of Defendants' agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief, established and/or ratified at the highest corporate levels of the Defendants.

## FEDERAL JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the State-law claims. Under 31 U.S.C. § 3730(e), and under the comparable provisions of the State statutes, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

14.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, all Defendants do business within the District and Defendant Genentech can be found in and transacts business in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because all Defendants do business within this District and Defendant Genentech can be found in and transacts business in this District. Defendants regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

**THE REGULATORY ENVIRONMENT**

**FDCA**

16.     The United States Food, Drug and Cosmetic Act (FDCA) establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States, including the introduction of new drugs into interstate commerce.  When the United States Food and Drug Administration ("FDA") approves a drug, it approves the drug only for the particular use for which it was tested.

17.     A drug's FDA-approved uses and dosages are called the drug's "indication." "Off-label" prescribing of drugs occurs when a drug is prescribed by a medical professional beyond the drug's indication. This includes prescribing a drug for a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified in the label, or to treat a different patient population.

18.     While a physician may prescribe a drug for a use other than one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses.  21 U.S.C. § 331(d), 355(a).  It, therefore, is illegal for a drug manufacturer and its sales representatives to initiate discussions with medical professionals regarding any off-label use of the drug.

19.     The dissemination of information or materials by a pharmaceutical manufacturer of any unapproved or off-label use, also known as "misbranding," constitutes unlawful promotional advertising of the drug, violates the FDCA, and can also serve as the basis for an FCA violation.

20.     In addition to prohibiting manufacturers from directly marketing and promoting a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from employing indirect methods to accomplish the same end.  For example, the FDA regulates two of the most prevalent indirect promotional strategies:   (A) manufacturer dissemination of medical and scientific publications concerning the off-label uses of their products; and (B) manufacturer support for Continuing Medical Education ("CME") programs and "speaker" programs, that focus on off-label uses.

21.     With regard to the first practice—disseminating written information—the FDCA allows a manufacturer to disseminate information regarding off-label usage only in response to an "unsolicited request from a health care practitioner."   21 U.S.C. § 360aaa-6.   In any other circumstance, a manufacturer is permitted to disseminate information concerning the off-label uses of a drug only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use; and has provided the materials to the FDA prior to dissemination.  The materials must be submitted in an unabridged form and must not be false or misleading.  21 U.S.C. §§ 360aaa(b) & (c);360aaa-1.

22.     The promotion of an off-label use for a prescription drug can interfere with the proper treatment of a patient. Off-label promotion can lull a physician into believing that the drug being promoted is safe and effective for the intended off-label use, and that the FDA has approved the drug for that use. Thus, off-label promotion can cause a doctor and patient to forgo treatment with an FDA-approved drug that has been proven to be safe and effective, and instead to substitute a

treatment urged by the sales representative that is not known to be safe and effective, and that may in fact be harmful.

## Anti-Kickback Act

23.    Pursuant to the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE.

24.    The Anti-Kickback Act is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

25.    Every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of healthcare services in the United States.

26.    The Anti-Kickback Act prohibits suppliers such as pharmaceutical manufacturers from compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

## False Claims Act

27.    The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986, and again in 2009. Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.   The

amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. The 2009 amendments were intended to further this intent by plugging the loopholes created since the 1986 amendments to ensure that the False Claims Act reaches all fraud schemes.

28. The FCA provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

29. The FCA allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendant during that time). Based on these provisions, *qui tam* plaintiff/relator seeks through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

30. The FCA provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of

damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

## GOVERNMENT HEALTHCARE PROGRAMS

31.     Government Healthcare Programs cover prescription drugs. They include but are not limited to the following programs.

### Medicare

32.     Medicare is a federally-funded health insurance program primarily benefiting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. The Medicare program is administered through the Department of Health and Human Services' Centers for Medicare and Medicaid Services.

33.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other healthcare providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

34.     The Medicare program Part D drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k). The Part D prescription drug program, which has a 25 percent co-payment, is also laden with annual "doughnut hole" — reached when a patient's total drug costs hit $2,700, after which the patient must shoulder the next $3,000 or so

before coverage resumes.

### (1) Off-label Coverage Under Medicare

35.    Medicare provides for drug coverage only where the use of a drug has been shown to be safe and effective and is otherwise reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A). Drugs approved for marketing by the FDA are considered safe and effective when used for indications specified on the labeling.

36.    Medicare coverage of an outpatient drug for an off-label use occurs only where the use is medically accepted, taking into account the major drug compendia: Drugdex, American Hospital Formulary Service (AHFS), American Medical Association Drug Evaluations (AMADE) and U.S. Pharmacopeia-Drug Information (USPDI), authoritative medical literature, and/or accepted standards of medical practice. *See* Medicare Benefit Policy Manual Chap. 6 § 30 & Chap. 15, § 50.4.1. & .2.

### (2) Off-Label Coverage Under Medicare for Cancer

37.    The 1993 Omnibus Budget Reconciliation Act mandated that Medicare provide coverage for off-label uses of drugs in anti-cancer chemotherapy regimens if those uses were supported by designated compendia. From 1993 – 2008, Medicare had specific requirements that must be met before it would pay for an off-label use of an anti-cancer drug. The coverage policy is articulated in Section 2049.4 of the Medicare Carriers Manual (MCM):

> FDA approved drugs used for indications other than what is indicated on the official label may be covered under Medicare if the carrier determines the use to be medically accepted, taking into consideration the major drug compendia, authoritative medical literature and/or accepted standards of medical practice. In the case of drugs used in anti-cancer chemotherapeutic regimen, unlabeled uses are covered for a medically accepted indication as defined as § 2049.4.C.

Section 2049.C provides, in part:

Contractors must not deny coverage based solely on the absence of FDA approved labeling for the use, if the use is supported by one of the following and the use is not listed as "not indicated" in any of the three compendia ... American Hospital Formulary Service Drug Information ... American Medical Association Drug Evaluations (AMADE) ... United States Pharmacopoeia Drug Information (USPDI), ... or "use supported by clinical research that appears in peer-reviewed medical literature."

38.     In Fall 2007, CMS announced that it would use its statutorily allowed discretion to review and update the list of compendia that are available as references for off-label coverage. At the conclusion of its first review cycle in 2008, CMS added three new compendia to the list of designated publications: the National Comprehensive Cancer Network Drugs and Biologics Compendium, DrugDex, and Clinical Pharmacology. AHFS continues to be recognized (while the USPDI and AMADE had been discontinued). CMS also articulated that contractors may consider scientific evidence if published in one of 26 designated peer-reviewed journals.

39.     In October 2008, CMS issued a revision to the Medicare Benefit Policy Manual consistent with the earlier 2008 directive, stating that contractors will consider the following points when considering coverage: 1) whether the clinical characteristics of the beneficiary and the cancer are adequately represented in the published evidence; 2) whether the administered chemotherapy regimen is adequately represented in the published evidence; 3) whether the reported study outcomes represent clinically meaningful outcomes experienced by patients; and 4) whether the study is appropriate to address the clinical question.

40.     The Medicare Benefit Policy Manual Chapter 15, Section 50.4.5 ("Off-Label Use of Drugs and Biologicals in an Anti-Cancer Chemotherapeutic Regimen") effective as of October 24, 2008, provides in part:

D. Generally

FDA-approved drugs and biologicals may also be considered for use in the determination of medically accepted indications for off-label use if determined by the

contractor to be reasonable and necessary.

If a use is identified as not indicated by the Centers for Medicare and Medicaid Services (CMS) or the FDA, or if a use is specifically identified as not indicated in one or more of the compendia listed, or if the contractor determines, based on peer-reviewed medical literature, that a particular use of a drug is not safe and effective, the off-label usage is not supported and, therefore, the drug is not covered.

## The Medicaid Program

41.     The federal Government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals.  The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS.  *See* 42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  *See* 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).  The federal Government, then, pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan ..." *See* 42 U.S.C. § 1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").

42.     Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal Government and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

43.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs.

44.     Reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). Covered outpatient drugs do not include drugs that are

"used for a medical indication which is not a medically accepted indication." *Id.* § 1396r-8(k)(3). A medically accepted indication is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is *supported* by a citation in specified drug compendia. *Id.* (emphasis added); § 1396r-8(k)(6). 42 U.S.C.§ 1396r-8(g)(1)(B)(i) identifies the compendia to be consulted: American Hospital Formulary Service Drug Information; United States Pharmacopeia-Drug Information (not in publication since July 2007); the DRUGDEX Information System; and the American Medical Association Drug Evaluations (not in publication since June 2008). Providers use Healthcare Common Procedure Coding System (HCPCS) J-codes to bill the Medicaid program for injectable prescription drugs, including cancer drugs. All other drugs are billed to Medicaid by identifying their National Drug Codes (NDC's).

### Reimbursement Under Other Federal Healthcare Programs

45.     CHAMPUS/TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100 percent service-connected disabilities.

46.     The Department of Veteran Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are dispensed to beneficiaries. It also supports a mail service prescription program as part of the outpatient drug benefit. The system serves approximately four million veterans.

47.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

48.     Coverage of off-label drug use under these programs is similar to coverage under the Medicare and Medicaid programs. *See, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

**INFORMATION ABOUT TARCEVA**

49.     Tarceva (erlotinib) received initial U.S. Food and Drug Administration ("FDA") approval in 2004, for second-line non-small cell lung cancer ("NSCLC"). Its second-line use is set forth in the package insert as indicated for: treatment of locally advanced or metastatic non-small cell lung cancer after failure of at least one prior chemotherapy regimen (FDA-approved on 11/18/2004).

50.     In April 2010, the FDA granted approval for Tarceva as a maintenance therapy for non-small-cell lung cancer patients; a decision that defied the negative 12-to-1 panel vote December 2009 by the Oncologic Drugs Advisory Committee. Analysts and reviewers during the Committee meeting pointed to a lack of data showing that maintenance treatment is more effective than waiting to treat patients until once the disease has progressed. (See *BioWorld Today*, Dec. 17, 2009.) The maintenance indication set forth in the package insert reads: "maintenance treatment of patients with locally advanced or metastatic non-small cell lung cancer (NSCLC) whose disease has not progressed after four cycles of platinum-based first-line chemotherapy." (FDA-approved on 4/16/2010)

51.     Subsequent to its approval, the FDA required Defendants to issue communications concerning potential dangers of Tarceva use. In September 2008, a "Dear Healthcare Professional" letter was issued to warn that patients with hepatic impairment who are treated with Tarceva should be closely monitored during therapy. In May 2009, a "Dear Healthcare Professional" letter was issued to warn patients taking Tarceva about GI perforation, exfoliative skin conditions and corneal

perforation/ulceration.

Information About Lung Cancer And Its Treatment

52.    There are various types of non-small cell lung cancers, each  with  different kinds of cancer cells, which grow and spread in different ways. NSCLC types include:

1.  Squamous cell carcinoma is a cancer that begins in squamous cells, which are thin, flat cells that look like fish scales. This is also called epidermoid carcinoma.

2.  Large cell carcinoma is a cancer that may begin in several types of large cells.

3.  Adenocarcinoma is a cancer that begins in the cells that line the alveoli and make substances such as mucus.

53.    A substantial percentage of lung cancers express cell surface epidermal growth factor receptors (EGFRs). EGFR mutation is a biomarker which can be detected in NSCLC tumor samples.

54.    Since  shortly  after  Tarceva's  approval,  many  diagnostic  companies  have  been marketing their test for EGFR mutations to the oncology community as a predictive marker for the use of Tarceva in NSCLC.  Defendants' management team conducted multiple analyses to determine the effect on sales if patients were tested for the biomarker. Defendants concluded that they would achieve greater sales *without* the biomarker testing – so Defendants counter-promoted this type of testing, even though it would have helped physicians to determine if Tarceva treatment would be best for their NSCLC patients.

Tarceva Off-Label Marketing

55.    Defendants promoted Tarceva for first-line off-label use in two patient populations with advanced NSCLC: (1) Never Smokers; and (2) females with adenocarcinoma. Defendants also

promoted Tarceva for maintenance use in NSCLC patients for many years prior to its 2010 FDA-approval for maintenance use. Tarceva would have had only modest sales "but for" the off-label promotion.

56.    Defendants promoted first-line use of Tarceva in metastatic NSCLC by cooking and molding what it called "retrospective exploratory analyses subset data", such that the end result was favorable statistics for the sales force to promote Tarceva off-label for first-line NSCLC in 1) female patients with adenocarcinoma; and 2) patients who had never smoked ("Never Smokers").

57.    Defendants promoted Tarceva in Never Smokers by misleading physicians into believing that the Tarceva registration trial indicated that all non-smokers using Tarceva experienced 13 months of survival (versus statistics for first-line combination treatments did not reach 13 months). This was not true, as Defendants knew that the survival rate for patients without the EGFR mutation would be much less, likely to be equal or even worse than placebo.

58.    First-line Never Smokers who received Tarceva but were negative for the EGFR mutation could have been put on a therapy other than Tarceva, and would be alive for years longer. Worse, patients who were candidates for the prescription drug crizotinib (Pfizer) could have received it in a clinical trial and be alive today. Cancer patients only get one shot at first-line treatments and Defendants took that opportunity away. Defendants instead promoted Tarceva for all patients, even though it knew that roughly half of its off-label market would have tested negative for the EGFR mutation. Defendants also knew that if they were tested, they would lose half the business in the first-line setting because the data was clear that Tarceva did not work in half the Never Smoker population. For these patients, Defendants caused them to die earlier and faster, with more pain. Defendants took the one shot these patients had at beating (if only temporarily) NSCLC – all in the name of greed.

59.     Defendants also promoted Tarceva off-label as first-line use for all females who were suffering from the adenocarcinoma NSCLC by pointing to heightened survival rates (supposedly ten months) for female patients; but Defendants failed to point out that there was NO BENEFIT for female patients with adenocarcinoma who had a history of smoking, and specifically lied about this in promotional pieces.

60.     These off-label uses neither appear in the Medicaid compendia nor are supported by clinical research that appears in the applicable peer-reviewed medical literature, and wholly fail to meet the criteria set forth in the applicable Medicare Manual and Part D Compendia for coverage of off-label uses, yet Defendants promoted it for such use.

<u>Defendants Had Knowledge That They Were Misleading Physicians and the Public</u>

61.     Defendants knew no later than 2004 that they were promoting off-label in a patient population in which Tarceva did not work. One example (and not the only one) are the results of the clinical trial known as TRIBUTE, which concluded in 2004. It was presented as an Abstract Session at the 2004 ASCO Annual Meeting, was a phase III trial of erlotinib HCl combined with carboplatin and paclitaxel (CP) chemotherapy in advanced non-small cell lung cancer (NSCLC). The study concluded that Erlotinib combined with carboplatin and paclitaxel chemotherapy did not confer a survival advantage over carboplatin and paclitaxel alone in patients with previously untreated advanced NSCLC.

62.     A 2007 email exchange between the senior leadership of OSI Pharmaceuticals and Genentech acknowledged that the statistics for Tarceva were not favorable, and that the success of any subset was tied to the presence of the EGFR gene.

63.     It is undisputed that Tarceva works in patients whose tumors have a mutation in the gene for EGFR. In all other patient populations, Tarceva only slightly delayed the median

progression of NSCLC, far less than necessary for FDA-approval. But Defendants' persisted in off-label marketing in these patient populations as well, in place of therapy that patients could have been taking which were effective treatments first–line. For example, Alimta, a more traditional chemotherapy pill sold by Eli Lilly, didn't just slow tumor progression, it also increased survival for patients with non-small-cell lung cancer by a median 2.8 months, extending survival to 13.4 months. Moreover, patients who are inappropriately prescribed Tarceva first-line never get the opportunity for appropriate second-line therapy, due to disease progression, affecting about 40% of first-line NSCLC patients.

## INFORMATION ABOUT XOLAIR

64.    In June of 2003, the FDA approved Xolair® omalizumab, which Defendant Genentech jointly has marketed with Defendant Novartis Pharmaceutical Corp. Xolair® is approved by the FDA for moderate to severe persistent asthmatics (age greater than or equal to 12 years old) who have a demonstrated sensitivity to a perennial aeroallergen, (e.g., dust mites, molds, animal dander, and cockroaches) and who have significant symptoms, despite inhaled corticosteroid treatment.

65.    The FDA approved only very specific indications for Xolair. Patients must have moderate-persistent to severe-persistent asthma, be older than 12 years, have a positive skin test to a perennial aeroallergen (e.g., dust mites, cats, dogs, and mold), and be symptomatic with inhaled corticosteroids.

66.    Asthma is a respiratory disorder characterized by increased responsiveness of the trachea and bronchi to various stimuli, resulting in the narrowing of the airways, along with mucous secretion. This airway hyper-responsiveness is reversible either spontaneously or through therapy.

The symptom triad includes wheezing, cough, and dyspnea, which can vary widely in severity and duration, although a typical attack does not last for more than several hours. Attacks can be triggered by a number of factors, including allergic triggers, smoke and pollution, cold air, colds and other respiratory infections, exercise, and strong emotions.

FDA Warnings

67.     In February 2007, the FDA issued an 'Alert' regarding Xolair® following receipt of reports of serious, life-threatening allergic reactions (anaphylaxis) after treatment with omalizumab (Xolair®). The FDA reported that usually these reactions occurred within two hours of receiving a Xolair® subcutaneous injection. On July 2, 2007 a Black Box Warning was placed on Xolair as follows:

> Anaphylaxis, presenting as bronchospasm, hypotension, syncope, urticaria, and/or angioedema of the throat or tongue, has been reported to occur after administration of Xolair. Anaphylaxis has occurred as early as after the first dose of Xolair, but also has occurred beyond 1 year after beginning regularly administered treatment. Because of the risk of anaphylaxis, patients should be closely observed for an appropriate period of time after Xolair administration, and health care providers administering Xolair should be prepared to manage anaphylaxis that can be life-threatening. Patients should also be informed of the signs and symptoms of anaphylaxis and instructed to seek immediate medical care should symptoms occur (see WARNINGS, and PRECAUTIONS, Information for Patients).

68.     In April 2009, the FDA issued a Warning Letter to Defendant Genentech concerning websites for several of its drugs, including for Xolair. In it, the FDA admonished Defendant Genentech as follows:

> The sponsored link for Xolair misleadingly broadens the indication for Xolair by implying that all patients with allergic asthma are candidates for Xolair therapy ("Are you suffering from allergic asthma? The cause might be IgE"; presented along with the name of the drug), when this is not the case. Rather, as stated in its PI, Xolair

is only indicated for patients 12 years and older with moderate to severe persistent asthma "who have a positive skin test or in vitro reactivity to a perennial aeroallergen and whose symptoms are inadequately controlled with inhaled corticosteroids." Additionally, the sponsored link fails to convey that the safety and efficacy of Xolair has not been established in other allergic conditions.

69.     On July 16, 2009 the FDA issued an "Early Communication about an Ongoing Safety Review of Omalizumab (marketed as Xolair)." The FDA told the public that it is evaluating interim safety findings from an ongoing study of Xolair (omalizumab) titled Evaluating the Clinical Effectiveness and Long-Term Safety in Patients with Moderate to Severe Asthma (EXCELS) that suggests a disproportionate increase in heart attacks, abnormal heart rhythms, heart failure, fainting, mini-strokes and blood clots. The EXCELS study is ongoing and final results are not expected until 2012.

Xolair Off-Label Marketing

70.     Defendants Genentech and Novartis promoted Xolair as an effective drug for the entire allergic cascade, including improving positive outcomes of immunotherapy. Defendants Genentech and Novartis promoted Xolair for food allergy (especially peanuts), for latex allergy, Allergic rhinitis, eczema, atopic dermatitis, and/or systemic anaphylaxis to drugs.

71.     These off-label uses neither appear in the compendia nor are supported by clinical research that appears in the applicable peer-reviewed medical literature, and wholly fail to meet the criteria set forth in the applicable Medicare Manual and Part D Compendia for coverage of off-label uses, yet Defendants promoted it for such use.

## UNLAWFUL PROMOTIONAL TACTICS

72.    Defendants' management trained and directed its sales force to promote the subject drugs for off-label uses that were not covered under any Government Healthcare Program.

73.    In order to successfully carry out the off-label promotion, Defendants conducted national and regional sales meetings, designed specifically for the purpose of training employees on off-label sales and marketing techniques: (a) copying and distributing studies, abstracts, reviews, Continuing Medical Education (CME) monographs, DVD's, movies, and slide presentations, all containing off-label usage; (b) sales calls to both clinicians, patients and their families solely for the purpose of off-label selling; and (c) the use of inducements.

74.    Through this planning, Defendants funded abstract, journal, and other articles advocating off-label uses, which ultimately, Defendants planned to be used by its sales representatives to promote the subject drugs. Indeed, the sales force was given such articles with the expectation that he learn the details backwards and forwards, and use the talking points provided by Defendants in promoting the subject drugs off-label.

75.    Defendants' off-label promotion raises safety issues, has adversely affected the treatment of patients, and undermined the FDA drug approval process. Defendants undertook this illegal off-label promotion for their own financial gain, despite the potential risk to patients' health and lives.

76.    Anticipating the possibility of resistance from physicians in prescribing the subject drugs for the off-label uses, Defendants specifically trained its sales representatives on how to respond to doctors' concerns about the off-label uses.

77.    Through its communications to its sales force and to doctors, Defendants deliberately omitted:

a.   Negative evidence about the subject drugs;

b.   Information that the doctors who were involved in peer selling had been paid substantial subsidies to use Genentech drugs on their patients for non-medically accepted or non-medically necessary purposes;

c.   Information related to dangerous side effects revealed through Genentech's internal research, adverse event reports, and independent research.

78.   Through its communications to the sales force and physicians, Defendants' suggested mechanisms of action that could explain the subject drugs' efficacy, safety profile, and use for the off-label uses, even though the subject drugs' mechanisms of action were not fully researched; and even though the explanations were a stretch at best.

79.   Defendants gave the sales force the incentive and the tools to market off-label:

a.   The sales force received training from Defendants' corporate training officials on subjects such as how to induce physicians to ask "unsolicited" questions and "lead discussions" about the subject drugs' off-label uses.

b.   Defendants reinforced this training by providing mandatory role playing sessions designed to replicate what the sales force would experience in the field when calling on physicians.

c.   In addition to communicating such practices during frequent regional and district sales conferences, Defendants engrained its off-label marketing messages during annual national sales meetings; Division, Territory, and District meetings; and other specific gatherings.

d.   Once out on the field, the sales force was given marketing materials and detail aids, useable for selling in the off-label market.

e.     Defendants monitored the success of the off-label promotional program by carefully monitoring sales revenues of each drug and each region, territory, and area.  The sales goals included rewarding management for off-label, as well as on-label prescriptions.  The only way that specific goals could be met was through a compensation system that was related to the off-label promotion of the drugs.

f.     The sales force was given credit for every prescription of Tarceva and Xolair, not just on-label prescriptions.  Indeed, no sales representative would be able to meet their sales goals, as designated by Genentech, without a large amount of off-label use in their territory.  This in turn, encouraged and mandated rampant off-label behavior in the territory.

g.     Defendants facilitated the use of physician speakers to further carry its message. Speakers were provided with inducements to deliver the off-label messages; the sales force was directed to find out what the "advocate" needs, such as clinical trial involvement, medical school grants, publications support, speaking engagements, CME grants, slide development support, visiting professorships, clinical guidelines development support, disease management programs, advisory panels, and consultancy agreements /contracts.

h.     Physicians, nurses, and other clinicians were "groomed" by Defendants to be speakers by attending all-expense paid speaking seminars in resort-like atmospheres. These seminars were, in truth, designed to market the subject drugs for off-label uses.

80.     At clinician speaker meetings there were no corrections or admonitions by anyone on behalf of Genentech if speakers deviated from on-label discussion, and in fact, it was encouraged. Moreover, additional slides which suggested or prompted off-label use were presented by clinician-speakers on behalf of Genentech.

81.   Clinicians were even "groomed" by Genentech to be speakers by attending all expense paid speaking seminars in resort-like atmospheres. These seminars were in truth designed to market their drugs, including off-label. Defendants also retained clinicians to speak to other clinicians, during peer-to-peer sessions, about the off-label use of their drugs.

## UNLAWFUL COVERAGE TACTICS

82.   Defendant Genentech was aware that off-label uses of its drugs would not be covered and payable by Medicare, Medicaid, or other Government Healthcare Programs unless Defendant caused the coverage to occur by active lobbying and promotion of the off-label uses to Medicare contractors, or the applicable compendia. Defendant did in fact actively promote the off-label uses to Medicare contractors and the compendia, at times using misleading tactics to attain the goal.

83.   Defendant was aware that its improper attempts to remove coverage blocks and facilitate off-label coverage from Medicare Contractors and the compendia did in fact result in claims to Medicare, Medicaid, and other Government Healthcare programs for the off-label uses. Defendant was aware that its promotion activities was a substantial factor in producing the coverage of various off-label uses and doses. For instance, Defendant Genentech made payments to Board members of the "National Comprehensive Cancer Network Drugs and Biologics Compendium" as part of its coordinated plan to influence coverage.

84.   Defendant was also aware that its coaching of physicians on how to bill to receive payment for off-label uses, without necessarily disclosing the off-label use in the claims coding, caused the payment of off-label claims.

## PRICING VIOLATIONS

85.     Defendant Genentech entered into a Rebate Agreement with the U.S. Secretary of Health and Human Services.  In that Agreement, Defendant agreed to comply with 42 U.S.C. §1396r-8, and hence:

(a)     Agreed to report its Best Price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, etc.

(b)     Agreed that it would determine its Best Price based upon its AMP, calculated as "net sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include that in the calculation, cash discounts and all other price reductions "which reduce the actual price paid"; and

(c) Agreed that the Best Price would not take into account nominal prices, defined as prices that are less than 10 percent of the AMP in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

86.     Since the first quarter of 2005, Defendant reported its AMP and Best Price in each quarter, to the Medicaid Program on Form CMS-367.  However, Defendant failed to take into account the conduct described below when reporting its Best Price for its drugs, Tarceva and Xolair. As a result, Defendant's Best Price, for Quarterly Reports submitted for at least since 2005, were inflated, which reduced the percentage difference between AMP and Best Price, thereby reducing the rebate amount that Defendant ultimately paid to each state Medicaid program.

87.     Defendant Genentech used the aggressive inducements described in this Complaint to increase utilization, but in doing so failed to abide by the Anti-kickback Law or to properly disclose these payments in Government Pricing Reports.

88.     Defendant Genentech provided incentives for its contracts with: National Account Customers ("NAC") Group Purchasing Organizations ("GPO") and Specialty Pharmacies ("SP"). These include GPOs such as International Oncology Network and U.S. Oncology, and SPs such as Accredo Nova Factor, Inc., Advanced Care Scripts, Inc., Biologics, Inc., BioScrip, Inc., CuraScript

Pharmacy, Inc.; to name a few.

89.   To induce SPs, Genentech paid them through "data" and "compliance and persistency" programs. Compliance and persistency contemplated clinical nurses assisting patients, but Genentech had its own nurse hotline and did not need to pay the Specialty Pharmacies for "compliance and persistency" programs.

90.   To induce NACs and GPOs as well as their members, Defendant Genentech would include monetary incentives in the contracts, in addition to the negotiated pricing structure. The monetary incentives on the surface would be for medical and patient advice programs, for data agreements, and other miscellaneous ostensibly legitimate purposes.

91.   Defendant Genentech did not include the incentives for government price reports. Thus, Defendant Genentech's government price reports were, and are, false statements either to avoid paying monies to the government or to obtain reimbursement monies from the government based on these reports.

92.   At all relevant times mentioned herein, Defendant Genentech was a signatory to a Rebate Agreement with CMS under which the Medicaid Program would receive rebates determined by Defendant's price reports of AMP and Best Price.

93.   Pursuant to the Rebate Agreement, Defendant Genentech submitted price reports directly to CMS purportedly reflecting AMP and Best Price for its covered products.

94.   Defendant Genentech submitted fraudulent quarterly price reports with respect to its products by intentionally misrepresenting AMP and Best Price by willfully excluding price cuts and other inducements offered to its customers that resulted in higher AMP and/or lower Best Price than the prices reported to CMS.

95.   Defendant Genentech intentionally submitted these false reports to avoid paying

higher rebates as required by federal law and its Rebate Agreement.

96.    Defendant Genentech knowingly made and used these false price reports and other false records and statements with the intent to conceal, avoid, or decrease an obligation to pay or transmit money to the government, e.g. its mandatory Medicaid rebate payments.

97.    Defendant Genentech had the authority and responsibility to make such reports, improperly abused the exercise of such authority, and as a direct and proximate result, the false record and statements were made to the government, and the federal and states' Medicaid programs were deprived of the much-needed appropriate rebate payments as a result of Defendant's intentionally inaccurate reporting of AMP and Best Price.

98.    In addition to blatantly violating the Medicaid Rebate Program price reporting requirements, Defendants repeatedly ran afoul of the price reporting rules of Medicare and nearly a dozen other Government Healthcare Programs, including: the Railroad Retirement Medicare program, 45 U.S.C. § 231, which provides Medical coverage for retired railroad workers; the Indian Health Service, 42 U.S.C. §§ 2002 2005, which provides healthcare for Native Americans; the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901 8914, which provides healthcare for federal employees and their dependants; the Tri Care program (formerly CHAMPUS), 10 U.S.C. §§ 1071 1106, which provides healthcare for Uniformed Services members and their dependants in civilian facilities; the State Legal Immigrant Assistance Grants ("SLIAG"), 8 U.S.C. § 1255a, 45 C.F.R. § 402.10, which provides funds to States for immigrant healthcare; and the State Children's Health Insurance Program ("SCHIP" or "CHIP"), 42 U.S.C. § 1397, which provides federal, matching funds for coverage for low-income children who are not eligible for Medicaid.

99.    These Government Healthcare Programs have their own price reporting rules. Medicare Part B reimbursement, for instance, is determined based on a manufacturer's quarterly

report of a price calculation, Average Sales Price (ASP). Other Government Healthcare Programs rely on similarly reported pricing information, such as the manufacturer's reported Best Price, Average Manufacturer Price (AMP), Non-Federal Average Manufacturer Price (Non-FAMP) and Most Favored Customer pricing. Other federal agencies, including the Department of Defense and the Bureau of Prisons, look to the Federal Supply Schedule, which lists the maximum prices for drugs based solely on the manufacturers' reported prices.

100.    Defendants failed to include these kickbacks in its reported pricing, thus submitting false pricing information, including false ASPs, AMPs, Non-FAMPs and Best Prices, to Government Healthcare Programs. Defendants submitted this false information with the intent that the Government Healthcare Programs would rely on these false reports in making their payment calculations and decisions.

101.    Defendants' false pricing information defrauded, and continues to defraud, Government Healthcare Programs, including Medicaid, Medicare, the Railroad Retirement Medicare program, the Indian Health Service, FEHBP, Tri Care, SLIAG and SCHIP.

102.    Accordingly, when Government Healthcare Programs purchased Defendants' products, directly or indirectly, in reliance upon Defendants' falsely reported prices, Defendants made a false record or statement to get a false or fraudulent claim paid or approved, and presented and caused to be presented a false or fraudulent claim for payment or approval in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2). In addition, when a Government Healthcare Program relied upon Defendants' falsely reported prices in calculating a rebate owed to that program based on utilization of Defendants' products, Defendants made a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(7).

103.   The Plaintiff States' false claims acts protect the States' share of Medicaid spending. The liability provisions of the Plaintiff States' false claims acts largely follow the language of the federal False Claims Act liability provisions, 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(7). Thus, the Genentech pricing schemes that impacted the Medicaid dollar violate the federal and state False Claims Acts.

**CLAIMS SUBMITTED TO GOVERNMENT HEALTHCARE PROGRAMS FOR OFF-LABEL USES WERE NOT COVERED**

104.   As stated by the National Cancer Institute:

> Use of a drug off label may cause harm when the drug's effect against a kind of cancer has not been demonstrated and there is no medical reason to believe the drug might be an effective treatment for that kind of cancer. All drugs have side effects; the side effects of cancer drugs vary depending on the kind of cancer being treated. When a drug's effect against a type of cancer has not been demonstrated, and its side effects are unknown, the possible risks of giving the drug may outweigh the possible benefits.

(www.cancer.gov/clinicaltrials/education/approval-process-for-cancer-drugs/allpages,   retrieved   on Oct. 11, 2010).

105.   The off-label uses discussed herein were not covered by any of the Government Healthcare Programs. They are not supported by any legitimate clinical research, and could not, under any circumstances, be determined to be "medically accepted as safe and effective" or "reasonable and necessary" for such uses, or supported by the compendia set forth in 42 U.S.C. § 1396r-8(k) or in the Medicare compendia set forth in the Medicare Manuals and regulations and Law. Claims for such off-label uses were therefore not covered by Government Healthcare Programs.

106.   Defendants were aware that the natural and probable consequence of its promotion of off-label uses of the subject drugs was that health care providers would submit claims for payment to Government Healthcare Programs for the off-label uses.

107.   Notwithstanding this knowledge, Defendants illegally, vigorously, and without any thought to the possible negative health effects to which it subjected patients, promoted these off-label uses.  Defendants are aware that its illegal promotion did in fact result in false claims to these and other government payors for the off-label uses.  Defendants are aware that its promotion activities were a substantial factor in producing the claims.

108.   Absent Defendants' illegal off-label marketing, which included false representations and unlawful inducements to physicians, the subject drugs would not have been prescribed by physicians for off-label indications. Defendants' off-label marketing programs have been extremely successful, leading to the submission of claims to the Government Healthcare Programs for medically unnecessary and imprudent prescriptions.

109.   Because prescriptions for off-label uses generally are not eligible for reimbursement under Government Healthcare Program regulations, submission of a claim for reimbursement for a drug prescribed off-label constitutes a false claim for the purposes of the Federal and State False Claims Acts. While it is a pharmacy, by virtue of the reimbursement system, which unwittingly submits the false prescription drug claim, the person or persons who knowingly cause(s) such a claim to be presented to the Government Healthcare Programs is liable under the law.

110.   The unwitting participation of the pharmacies in the submission of false claims was not only foreseeable; it was an intended consequence of Defendants' scheme of fraud.

111.   When pharmacies, physicians, and other health care providers submitted claims based upon a physician's prescription for the off-label uses, the claims they submitted were false because such off-label uses were not supported by a citation in one of the Drug Compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(I) (Medicaid); not supported by the compendia or "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined

to be "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare); and not covered by other Government Healthcare Programs, See, e.g., TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

112.    Since Defendants cannot submit claims directly to Government Healthcare Programs, they intentionally defrauded physicians to prescribe the subject drugs by engaging in a nationwide materially misleading off-label marketing campaign for the intended and foreseeable effect of causing physicians and pharmacists to submit claims to Government Healthcare Programs that were ineligible for reimbursement.

113.    False claims to these Government Healthcare Programs for off-label prescribing were the direct and proximate result of unlawful off-label marketing efforts by Defendants.  Defendants caused the submission of these claims.

114.    Defendants caused the submission of false claims, since health care providers submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Healthcare Programs, and the states submitted Form CMS-64 to the Federal Government, all claiming reimbursement for the subject drugs for such off-label uses.

**KICKBACKS**

Speaker Programs

115.    Defendant Genentech had an active speaker's bureau known by the acronym GENIE. The speakers were nominated by the sales force. Scientific affairs had no involvement with the GENIE program. When they did a ROI analysis of the number of additional prescriptions generated from the attendees, Defendants determined that it had a negative ROI. However, because the speakers

*themselves* were such high prescribers, a decision was made to continue the speakers bureau, for these speakers were writing a tremendous number of prescriptions, which more than made up for the cost of the programs. At all of these events, typically dinner programs, the speakers talked up the inflated survival benefits and the use of Tarceva as a first-line treatment. The slides for the GENIE speakers were prepared by Genentech. The GENIE core slides contained exploratory subset data as well.

116.    Defendant Genentech's GENIE program was a kickback program. An internal audit was conducted from 2006 through the 1st quarter of 2007. The auditors concluded that the primary risks of the program were "related to anti-kickback issues raised by GENIE practices around speaker selection, training, use and payments," and that in 2008, at a payout cost of $2-3 million, 450 speakers were trained but never used! Speakers were paid honorariums of over $2,300 to attend one speaker training event.

117.    Physicians were largely selected based upon criteria directly related to prescription writing, and not related to the identified purpose of the services in the contract, and not related to the expertise level necessary for a physician to be a speaker in the specific topic that they were paid to speak about.

Advisory Boards

118.    Defendant Genentech used advisory boards for marketing purposes. Called NSCLC advisory boards consisted of the following: 1) community ad boards (CABs); 2) regional ad boards (RABs); 3) national ad board; 4) EGFR summit; 5) diagnostic NAB. Defendant Genentech spent $1.5 million each year for Tarceva advisory boards.

119.   These meetings were for the ostensible purpose of getting input/feedback from physicians on drug performance, how they treat disease states, etc.; although internal e-mails clearly admit otherwise. For the Advisory Board meetings, honorariums, lavish entertainment and expenses for physicians, were paid for by Defendants.

Copayments

120.   Copayment is the portion of the cost of an item or service which the Medicare (and other Government Healthcare Programs) beneficiary must pay. The copayment amount at all material times for Medicare has generally been 20 percent of the cost of the pharmaceutical product.

121.   A supplier who routinely waives Medicare and Medicaid co-payments may be held liable under the Medicare and Medicaid anti-kickback statute, 42 U.S.C. § 1320a-7b(b). Under the anti-kickback statute, it is illegal to, inter alia, offer or pay anything of value as an inducement to generate business payable by any Government Healthcare Program.

122.   Defendant facilitated independent non-profits (INP) like the "Chronic Disease Fund" to provide a "grant" for patients to use their co-pay costs. The Specialty Pharmacies set up the grants by direct relationship with the INP's and the Specialty Pharmacies are paid electronically.

123.   Defendants coordinated with the INP's and specialty pharmacies to routinely waive patient copayments, as Defendants knew that such a waiver would influence the patients' selection of a particular drug.

124.   At no time did Defendants or any of the INP's/ specialty pharmacies determine in good faith that any patient for which the copayment was waived was actually in financial need, nor were reasonable collection efforts made to collect the copayment from the patient.

125. It was an inherent and routine part of Defendants' marketing programs to solicit new patients and retain existing patients by offering and actualizing copayment waivers of their products.

Lavish Entertainment

126. Sales Representatives across the country were allowed and instructed to spend lavishly on all physicians, typically at CME events, for both the speakers and invitees. In addition to honorarium payments by check, kickbacks were paid in-kind in the form of high-end food, wine and entertainment.

Phase IV Trials

127. Defendant OSI set up clinical trials solely for the purpose of generating sales. Unlike legitimate clinical trials: (1) The clinical trials were placed and managed by OSI's sales force, not any research division; (2) Their primary role was to generate sales for the sales force, not produce legitimate results which could be used for research.


**COUNT I—FALSE CLAIMS ACT**

128. Relator realleges and incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

129. This is a claim by Relator, on behalf of The United States, for treble damages and penalties under the False Claims Act, 31 U.S.C. 3729-3733 against Defendants for knowingly causing to be presented false claims to Government Healthcare Programs. From on or about 2005, in the Northern District of California and elsewhere throughout the United States, Defendants have

knowingly and willfully violated the False Claims Act by submitting and causing false claims to be submitted.

130.   Defendants have knowingly caused pharmacies and other health care providers to submit Pharmacy, CMS-1500, and other claim forms for payment, knowing that such false claims would be submitted to Government Healthcare Programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing prescriptions for prescriptions induced by kickbacks and/or for non-covered uses and therefore false claims. By virtue of the acts described in this Complaint, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

131.   Defendants have also violated the False Claims Act by causing the states to submit false claims to the United States Government in Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for which federal reimbursement was sought, were paid for in compliance with federal law.  States submitted false claims to the United States Government because when the products described herein were prescribed off-label, they were not prescribed for a medically accepted indication, were prescribed based upon kickbacks, and yet states sought reimbursement from the United States Government for all such off-label claims paid.

132.   Defendants caused false claims to be submitted, resulting in Government Program reimbursement to healthcare providers in the millions of dollars, in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Anti-Kickback Act 42 U.S.C. § 1320a-7b(b)(2)(A).

133.   The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim presented or caused to be presented.

WHEREFORE, Relators respectfully request this Court enter judgment against Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)    That the Relators be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)    That the Court award such other and further relief as it deems proper.

**COUNT II**
**FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(2) (*FDA Adverse Events*)**

134.    Relator realleges and incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

135.    The Food and Drug Administration ("FDA") is the agency responsible for protecting the health and safety of the American public by ensuring among other things, that pharmaceuticals designed for use in humans are safe and effective for their intended uses and are labeled accurately and in compliance with the law. Toward this end, FDA, pursuant to its statutory mandate, regulates and monitors the approval, manufacture, processing, packing, labeling, and shipment in interstate commerce of pharmaceuticals.

136.   At all material times, the Food, Drug and Cosmetic Act ("FDCA") prohibits the sale of unapproved new drugs in interstate commerce: "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application [to the FDA] is effective with respect to such drug."21 U.S.C. § 355(a).  A drug manufacturer or distributor obtains FDA approval by submitting a new drug application (NDA) or abbreviated new drug application (ANDA) in accordance with the FDCA and FDA regulations. See 21 U.S.C. § 355(b)-(b)(1); 21 C.F.R. § 314.50 (detailing contents of NDA).

137.   In 21 U.S.C. §355(k), Congress mandated the establishment of the postmarket risk identification and analysis system to ensure, *inter alia*, the safety and efficacy of pharmaceuticals already on the market.

138.   To implement Congress' mandate, the FDA promulgated 21 CFR 314.80, and 314.98, which require expedited reports of postmarketing adverse drug experiences (ADE) by drug manufacturers.  Applicants with approved NDAs (§ 314.80) and abbreviated new drug applications (ANDAs) (§ 314.98) are among those subject to these laws and regulations.

139.   The purpose of postmarketing Adverse Drug Experience (ADE) surveillance is to obtain information on rare, latent or long term drug effects not identified during premarket testing. Sponsors, manufacturers, packers and distributors are required to report all serious, unexpected (not listed in the drug product's current labeling) ADEs to FDA within 15 calendar days, in what is referred to as a "15-Day Alert Report."  A serious ADE is one that is fatal or life threatening, is permanently disabling, (or requires inpatient hospitalization, or is a congenital anomaly, cancer or overdose.) In addition, manufacturers are required to file with the FDA "Postmarketing Periodic Reports." These Reports are due quarterly for the first three years after U.S. approval of the NDA, and yearly thereafter.

140.    Sec. 314.80 (b) provides the affirmative duty that drug manufacturers "shall promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, ... postmarketing epidemiological/surveillance studies, ...."

141.    Sec. 314.80(b) further provides that, "any person subject to the reporting requirements . . . shall also develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA."

142.    Defendant Genentech maintained websites for all of its prescription drugs, which invited patients to answer questions about their usage. There were three websites for Avastin, one for Tarceva called "Lung Cancer Connection"; one called HER Connection for Herceptin; one called "Living With Lymphoma" for "Rituxan"; and one called "Asthma Matters" for Xolair. The websites were so successful they garnered survey responses from over 100,000 patients.

143.    Relator noticed problems with the Xolair e-marketing efforts almost immediately. First, he noticed that the "Asthma Matters" web site included a registration page for patients. As patients go through the form, it asks about their asthma and any negative side effects they have encountered with their medicine. Relator discovered that Defendant Genentech was keeping a database of answers, but they were not reporting any of the adverse events that were disclosed about Xolair from this online form. In talking with his colleagues, he discovered that this was true for other of the Defendant's cancer drugs. As of Fall 2010, Defendant removed all of the patient surveys for Xolair and removed the multiple other remaining websites in their entirety. No reports were made to the FDA from the survey data.

144.    Genentech has submitted false statements and records in connection with the Adverse Events reporting requirements of Genentech's New Drug Applications (NDAs) for its drugs. These

false statements and records were made by Genentech to the FDA and caused false claims made to Government Healthcare Programs to be paid or approved.

145.    Genentech suppressed knowledge of, and failed to submit full and complete Periodic Adverse Drug Experience Reports to the FDA, which would have shown that there were increased risks from Defendants' drugs associated with suicide, and with the in utero exposure of a developing fetus. Such conduct by Genentech deviated from the duties and conduct of a responsible pharmaceutical manufacturer and demonstrated a failure to ensure its own minimal compliance with requirements of the Federal Food Drug and Cosmetic Act.

146.    During the previous six years, it is unknown how many patients died or were injured after receiving Defendants' drugs. Multiple deaths and injuries, however, were purposefully not reported to the FDA. Defendants knew or should have known of all these incidents through the voicemail system at InfoMedics, and at all times had in their possession or control hundreds of incidents of reported adverse events detailed and submitted by consumers.

147.    Each time a consumer left a detailed message about an event that was both serious and unexpected, Genentech failed to record the information and then submit a post marketing 15 day "alert report" as required by Sec. 314.80 and applicable regulations. As Genentech failed to do so, it also failed to promptly investigate such adverse drug experiences and submit follow up reports within 15 calendar days of receipt of new information which Genentech should have taken steps to obtain, all as mandated by Sec. 314.80 and applicable regulations.

148.    Genentech was also required to submit "Periodic Adverse Drug Experience Reports." It was required to submit each adverse drug experience not reported under paragraph (c)(1)(i) of section 314.80 at quarterly intervals, for 3 years from the date of approval of each NDA, and then at annual intervals. Genentech was required to submit each quarterly report within 30 days of the close

of the quarter, and to submit each annual report within 60 days of the anniversary date of approval of the application.

149.    Genentech submitted false "periodic adverse drug experience reports" to the FDA on a quarterly, and later, yearly basis. Genentech did so because it failed to include the detailed adverse events left by the callers to InfoMedics as described in this complaint, serious adverse events and otherwise.  Genentech used these false "Periodic Adverse Drug Experience Reports" to get (false) claims paid in violation of the False Claims Act, to wit, claims for Defendant's drugs submitted to Government Healthcare Programs which would otherwise not have been paid or approved.

150.    Genentech, by suppressing and failing to disclose the above described adverse events, and also by disseminating false information to physicians and the public about the safety and efficacy of Defendant's drugs, caused physicians and other health care providers to prescribe Defendant's drugs and submit claims for Defendant's drugs in violation of the False Claims Act, when they otherwise would not have prescribed Defendant's drugs for their patients.

151.    Applicable laws and regulation, including Sec. 314.80(i), require Genentech "to maintain for a period of 10 years records of all adverse drug experiences known to the applicant, including raw data and any correspondence relating to adverse drug experiences." Genentech failed to do so.

152.    Applicable laws and regulations, including Sec. 314.80(j), provide that if an applicant such as Genentech "fails to establish and maintain records and make reports required under this section, FDA may withdraw approval of the application and, thus, prohibit continued marketing of the drug product that is the subject of the application." Genentech indeed failed to establish and maintain the records and reports required; yet, had Genentech not submitted false reports or records to the FDA, the FDA would have either withdrawn approval of Defendant's drugs or instituted

warnings and restrictions on Defendant's drugs which, at minimum, would have resulted in far less submissions of claims for Defendant's drugs to Government Healthcare Programs.

153.    Defendant Genentech has used a variety of false documents, including false submissions to the United States FDA, to cause the United States to continue to pay and approve claims for reimbursement under the Government Healthcare Programs, which claims would not have been reimbursed had CMS known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Defendant Genentech's drugs .

154.    From in or about 1999 to present, Defendant s conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(2).

155.    The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim paid or approved.

## COUNT III
## CALIFORNIA FALSE CLAIMS ACT

156.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

157.    This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

158.    Cal. Gov't Code § 12651(a) provides liability for any person who

> (1)   knowingly presents, or causes to be presented, to an officer or employee of the state or of

---

any political division thereof, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

...

(8) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

159.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

160.    Defendants violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct described herein.

161.    Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code § 650-650.1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the government funded healthcare programs.

162.    The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

163.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

164.   Had the State of California known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs described herein, it would not have paid the claims submitted by the healthcare providers and third party payers in connection with that conduct.

165.   As a result of Defendants' violation of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

166.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

167.   This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of California:

(1)   Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;
(2)   A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)  The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2)  Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)  An award of reasonable attorneys' fees and costs; and

(4)  Such further relief as this Court deems equitable and just.

## COUNT IV
## COLORADO MEDICAL ASSISTANCE ACT

168.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

169.   This is a *qui tam* action brought by Relators on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*

170.   Colo. Rev. Stat § 25.5-4-305 provides that it is unlawful to:

(a)  Intentionally or with reckless disregard make or cause to be made any false representation of a material fact in connection with a claim;

(b)  Intentionally or with reckless disregard present or cause to be presented to the state department a false claim for payment or approval;

(c)  Intentionally or with reckless disregard present or cause to be presented any cost document required by the medical assistance program that the person knows contains a false material statement...

171.   In addition, the payment or receipt of bribes or kickbacks is prohibited under the Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-305 (1)(e).

172.   Defendants furthermore violated Colorado Medical Assistance Act, Colo. Rev. Stat. § 25.5-4-305 *et seq.* and knowingly caused false claims to be made, used and presented to the State of

Colorado by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.* and Colo. Rev. Stat. § 25.5-4-305(1)(e) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

173.    The State of Colorado, by and through the Colorado Medical Assistance Act and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

174.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Colorado.

175.    Had the State of Colorado known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

176.    As a result of Defendants' violation of Colo. Rev. Stat § 25.5-4-305, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

177.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Colorado Medical Assistance Act, Colo. Rev. Stat § 25.5-4-304 *et seq.* on behalf of themselves and the State of Colorado.

178.    This Court is requested to accept pendant jurisdiction over this related state claim as it

---

FALSE CLAIMS ACT COMPLAINT
45

is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Colorado:

(1)     Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;
(2)     A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of Colorado;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Colorado Medical Assistance Act, Colo. Rev. Stat § 25.5-4-304 *et seq.* and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)     An award of reasonable attorneys' fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

### COUNT V
### CONNECTICUT FALSE CLAIMS ACT

179.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

180.    This is a *qui tam* action brought by Relators on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Public Act No. 09-5 *et seq.*, signed by the Governor on October 5, 2009.

181.    Conn. Public Act No. 09-5 § 2(a) provides that no person shall:

(1)     Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or

approval under medical assistance programs administrated by the Department of Social Services;

(2)     Knowingly make, or cause to be made or used a false record or statement to secure the payment by the state of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services;

(3)     Conspire to defraud the state by securing the allowance of payment of a false claim under medical assistance programs administered by the Department of Social Services.

182.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Connecticut False Claims Act, Public Act No. 09-5 § 16(a).

183.   Defendants furthermore violated Conn. Public Act No. 09-5 § 2(a) and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Conn. Public Act No. 09-5 § 2(a) and § 16(a) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

184.   The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

185.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Connecticut.

186.   Had the State of Connecticut known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject

drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

187.    As a result of Defendants' violation of Conn. Public Act No. 09-5 § 2(a), the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

188.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Connecticut False Claims Act, Public Act No. 09-5 *et seq.* on behalf of themselves and the State of Connecticut.

189.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Connecticut:

(1)    Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;
(2)    A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of Connecticut;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Connecticut False Claims Act, Public Act No. 09-5 *et seq.* and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)    An award of reasonable attorneys' fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT VI
## DELAWARE FALSE CLAIMS AND REPORTING ACT

190. Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

191. This is a *qui tam* action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

192. 6 Del. C. § 1201(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or
(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

193. In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

194. Defendants violated 31 Del. C. § 1005 by engaging in the conduct described herein.

195. Defendants furthermore violated 6 Del. C. § 1201(a) and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws, including the FDCA, the Anti-Kickback Act, and 31 Del. C. § 1005 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

196. The State of Delaware, by and through the Delaware Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

197.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

198.   Had the State of Delaware known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

199.   As a result of Defendants' violation of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

200.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

201.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Delaware:

       (1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

     (2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

     (3)     Prejudgment interest; and

     (4)     All costs incurred in bringing this action.

To Relators:

     (1)     The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

     (2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

     (3)     An award of reasonable attorneys' fees and costs; and

     (4)     Such further relief as this Court deems equitable and just.

## COUNT VII
## FLORIDA FALSE CLAIMS ACT

202.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

203.    This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

204.    Fla. Stat. § 68.082(2) provides liability for any person who-

(a) knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c) conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

205.    In addition, Fla. Stat. § 409.920 makes it a crime to:

(c) knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or

service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;

* * *

(e) knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

206.    Fla. Stat. § 456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

207.    Defendants violated Fla. Stat. § 409.920(c) and (e) and § 456.054(2) by engaging in the conduct described herein.

208.    Defendants furthermore violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Fla. Stat. § 409.920 (c) and (e) and § 456.054(2) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

209.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

210.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of

1   payment of claims submitted to the State of Florida in connection with Defendants' conduct.

2   Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was also an express

3   condition of payment of claims submitted to the State of Florida.

4

5       211.    Had the State of Florida known that false representations were made to both the FDA

6   and to practitioners about the true state of affairs regarding the safety and efficacy of the subject

7   drugs, it would not have paid the claims submitted by healthcare providers and third party payers in

8   connection with that conduct.

9       212.    As a result of Defendants' violation of Fla. Stat. § 68.082(2), the State of Florida has

10  been damaged in an amount far in excess of millions of dollars exclusive of interest.

11

12      213.    Relators are private citizens with direct and independent knowledge of the allegations

13  of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of

14  themselves and the State of Florida.

15      214.    This Court is requested to accept pendant jurisdiction of this related state claim as it is

16  predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the

17  State of Florida in the operation of its Medicaid program.

18

19      WHEREFORE, Relators respectfully request this Court to award the following damages to

20  the following parties and against Defendants:

21  To the State of Florida:

22      (1)     Three times the amount of actual damages which the State of Florida has
23              sustained as a result of Defendants' conduct;
24      (2)     A civil penalty of not less than $5,500 and not more than $11,000 for each
                false claim which Defendants caused to be presented to the State of Florida
25      (3)     Prejudgment interest; and
        (4)     All costs incurred in bringing this action.
26
27  To Relators:
28

(1)  The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;
(2)  Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)  An award of reasonable attorneys' fees and costs; and
(4)  Such further relief as this Court deems equitable and just.

## COUNT VIII
## GEORGIA FALSE MEDICAID CLAIMS ACT

215.  Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

216.  This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 (2008) *et seq.*

217.  O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1)  knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
(2)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;
(3)  conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

218.  Defendants violated O.C.G.A. § 49-4-168 *et seq.* by engaging in the conduct described herein.

219.  Defendants furthermore violated O.C.G.A. § 49-4-168 and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

220. The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

221. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

222. Had the State of Georgia known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

223. As a result of Defendants' violation of O.C.G.A. § 49-4-168, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

224. Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to O.C.G.A. § 49-4-168 on behalf of themselves and the State of Georgia.

225. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Georgia:

    (1)    Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT IX
## HAWAII FALSE CLAIMS ACT

226.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

227.    This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

228.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

            ***

(8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to

disclose the false claim to the State within a reasonable time after discovery of the false claim.

229.   Defendants violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

230.   The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

231.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

232.   Had the State of Hawaii known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

233.   As a result of Defendants' violation of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

234.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of

1   themselves and the State of Hawaii.

2       235.   This Court is requested to accept pendant jurisdiction of this related state claim as it is

3   predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the

4   State of Hawaii in the operation of its Medicaid program.

5

6       WHEREFORE, Relators respectfully request this Court to award the following damages to

7   the following parties and against Defendants:

8   To the State of Hawaii:

9       (1)   Three times the amount of actual damages which the State of Hawaii has
10              sustained as a result of Defendants' illegal conduct;
        (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each
11              false claim which Defendants caused to be presented to the State of Hawaii;
        (3)   Prejudgment interest; and
12      (4)   All costs incurred in bringing this action.

13  To Relators:

14
        (1)   The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and/or
15              any other applicable provision of law;
        (2)   Reimbursement for reasonable expenses which Relators incurred in connection
16              with this action;
        (3)   An award of reasonable attorneys' fees and costs; and
17      (4)   Such further relief as this Court deems equitable and just.

18

19

20                          **COUNT X**
21      **ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT**

22

23      236.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127

24  above as if fully set forth herein.

25      237.   This is a *qui tam* action brought by Relators on behalf of the State of Illinois to recover

26  treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740

27  Ill. Comp. Stat. 175 *et seq.*

28

238.   740 Ill. Comp. Stat. 175/3(a) provides liability for any person who:

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (3)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

239.   In addition, 305 Ill. Comp. Stat. 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

240.   Defendants violated 305 Ill. Comp. Stat. 5/8A-3(b) by engaging in the conduct described herein.

241.   Defendants furthermore violated 740 Ill. Comp. Stat. 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

242.   The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

243.   Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

244.   Had the State of Illinois known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

245.   As a result of Defendants' violation of 740 Ill. Comp. Stat. 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

246.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 Ill Comp. Stat. 175/3(b) on behalf of themselves and the State of Illinois.

247.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Illinois:

(1)   Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;
(2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)  The maximum amount allowed pursuant to 740 Ill. Comp. Stat.175/4(d) and/or any other applicable provision of law;

(2)  Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)  An award of reasonable attorneys' fees and costs; and

(4)  Such further relief as this Court deems equitable and just.

## COUNT XI
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

248.  Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

249.  This is a *qui tam* action brought by Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.* provides:

Sec. 2.(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;
(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;
(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;
(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;
(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;
(7) conspires with another person to perform an act described in subdivisions (1) through (6); or
(8) causes or induces another person to perform an act described in subdivisions (1) through (6)...

250.  In addition, Indiana Code 5-11-5.5 *et seq.* prohibits the solicitation or receipt of any

---

FALSE CLAIMS ACT COMPLAINT

remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Indiana Medicaid program.

251.    Defendants violated the Indiana Code 5-11-5.5 *et seq.* by engaging in the conduct described herein.

252.    Defendants furthermore violated Indiana Code 5-11-5.5 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Indiana Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

253.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

254.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

255.    Had the State of Indiana known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

256.    As a result of Defendants' violation of Indiana Code 5-11-5.5 *et seq.*, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

257.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Indiana Code 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

258.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Indiana:

   (1)    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;
   (2)    A Civil penalty of at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the State of Indiana;
   (3)    Prejudgment interest; and
   (4)    All costs incurred in bringing this action.

To Relators:

   (1)    The maximum amount allowed pursuant to Indiana Code 5-11-5.5 *et seq.* and/or any other applicable provision of law;
   (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
   (3)    An award of reasonable attorneys' fees and costs; and
   (4)    Such further relief as this Court deems equitable and just.


## COUNT XII
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

259.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

260.    This is a *qui tam* action brought by Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. 46: 437.1 *et seq.*

261.    La. Rev. Stat. 46: 438.3 provides-

(A) No person shall knowingly present or cause to be presented a false or fraudulent claim;
(B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;
(C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

262.    In addition, La. Rev. Stat. 46: 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

263.    Defendants violated La. Rev. Stat. 46: 438.2(A) by engaging in the conduct described herein.

264.    Defendants furthermore violated La. Rev. Stat. 46: 438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. 456: 438.2(A), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

265.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

266.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

267.  Had the State of Louisiana known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

268.  As a result of Defendants' violation of La. Rev. Stat. 46: 438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

269.  Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. 46: 439.1(A) on behalf of themselves and the State of Louisiana.

270.  This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Louisiana:

(1)  Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;
(2)  A civil penalty of up to $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;
(3)  Prejudgment interest; and
(4)  All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**COUNT XIII**
**MARYLAND FALSE HEALTH CLAIMS ACT OF 2010**

271.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

272.    This is a *qui tam* action brought by Relators on behalf of the State of Maryland to recover treble damages and civil penalties under the Md. Health General Code Subtitle 6 §§ 2-601 *et seq.*

273.    Md. Health General Code Subtitle 6 § 2-602 provides in pertinent part:

(a)    A person may not:

    (1)    Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

    (2)    Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim ...

              ***

    (9)    Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

274.    Defendants furthermore violated Md. Health General Code Subtitle 6 § 2-602 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

275.    The State of Maryland, by and through the Maryland Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

276.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct. Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Maryland.

277.    As a result of Defendants' violation of Md. Health General Code Subtitle 6 § 2-602 et seq., the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

278.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Md. Health General Code Subtitle 6 § 2-602 et seq. on behalf of themselves and the State of Maryland.

279.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Maryland:

(1)    Three times the amount of damages that the State of Maryland sustains as a result of Defendants' conduct;

(2)    A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State Maryland;

(3)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Md. Health General Code Subtitle 6 § 2-602 *et seq.* and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)    An award of reasonable attorneys' fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XIV
## MICHIGAN MEDICAID FALSE CLAIMS ACT

280.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

281.    This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI ST Ch. 400.603 *et seq.*

282.    400.603 provides liability in pertinent part as follows:

Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits;
(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit...

283.    In addition, MI ST Ch. 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

284.    Defendants violated MI ST Ch. 400.603 *et seq.* by engaging in the conduct described herein.

285.    Defendants furthermore violated, MI ST Ch. 400.603 *et seq.* and knowingly caused

false claims to be made, used and presented to the State of Michigan by its deliberate and systematic

violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of

the fact that none of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

286.    The State of Michigan, by and through the Michigan Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

healthcare providers and third party payers in connection therewith.

287.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express condition of

payment of claims submitted to the State of Michigan in connection with Defendants' conduct.

Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an

express condition of payment of claims submitted to the State of Michigan.

288.    Had the State of Michigan known that false representations were made to both the

FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject

drugs, it would not have paid the claims submitted by healthcare providers and third party payers in

connection with that conduct.

289.    As a result of Defendants' violation of MI ST Ch. 400.603 *et seq.* the State of

Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

290.    Relators are private citizens with direct and independent knowledge of the allegations

of this Complaint, who have brought this action pursuant to MI ST Ch. 400.603 *et seq.* on behalf of

themselves and the State of Michigan.

291.    This Court is requested to accept pendant jurisdiction of this related state claim as it is

predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the

1   State of Michigan in the operation of its Medicaid program.

2       WHEREFORE, Relators respectfully request this Court to award the following damages to

3   the following parties and against Defendants:

4       To the State of Michigan:

5

6       (1)   Three times the amount of actual damages which the State of Michigan has
              sustained as a result of Defendants' conduct;

7       (2)   A civil penalty equal to the full amount received for each false claim which
              Defendants caused to be presented to the State of Michigan;

8       (3)   Prejudgment interest; and

9       (4)   All costs incurred in bringing this action.

10      To Relators:

11      (1)   The maximum amount allowed pursuant to MI ST Ch. 400.603 *et seq.* and/or
              any other applicable provision of law;

12      (2)   Reimbursement for reasonable expenses which Relators incurred in connection
              with this action;

13      (3)   An award of reasonable attorneys' fees and costs; and

14      (4)   Such further relief as this Court deems equitable and just.

15

16                          **COUNT XV**
                   **MINNESOTA FALSE CLAIMS ACT**

17

18      292.  Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127

19   above as if fully set forth herein.

20      293.  This is a *qui tam* action brought by Relators on behalf of the State of Minnesota to

21   recover treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. §

22   15C.01, *et seq.*

23

24      294.  Minn. Stat. § 15C.02 provides civil liability for any person who:

25          (1) knowingly presents, or causes to be presented, to an officer
        or employee of the state or a political subdivision a false or fraudulent

26      claim for payment or approval;

27

28

                          ————————————————
                     FALSE CLAIMS ACT COMPLAINT
                                70

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;...

295.   In addition, the State of Minnesota prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Minnesota False Claims Act. Defendants violated Minn. Stat. § 15C.01, *et seq.* by engaging in the conduct described herein.

296.   Defendants furthermore violated, Minn. Stat. § 15C.01, *et seq.* and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

297.   The State of Minnesota, by and through the Minnesota False Claims Act program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

298.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Minnesota.

299.   Had the State of Minnesota known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

300.   As a result of Defendants' violation of Minn. Stat. § 15C.01, *et seq.* the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

301.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Minn. Stat. § 15C.01, *et seq.* on behalf of themselves and the State of Minnesota.

302.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Minnesota:

(1)   Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;
(2)   A civil penalty equal to the full amount received for each false claim which Defendants caused to be presented to the State of Minnesota;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to Minn. Stat. § 15C.01, *et seq.* and/or any other applicable provision of law;
(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)   An award of reasonable attorneys' fees and costs; and
(4)   Such further relief as this Court deems equitable and just.

FALSE CLAIMS ACT COMPLAINT
72

1
2
3
4

**COUNT XVI**
**NEVADA FALSE CLAIMS ACT**

5      303.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127

6   above as if fully set forth herein.

7      304.    This is a *qui tam* action brought by Relators on behalf of the State of Nevada to

8

9   recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §

10  357.010, *et seq.*

11     305.    Nev. Rev. Stat. § 357.040(1) provides liability for any person who—

12          (a) knowingly presents or causes to be presented a false claim for
13          payment or approval;
            (b) knowingly makes or uses, or causes to be made or used, a false
14          record or statement to obtain payment or approval of a false claim
            (c) conspires to defraud by obtaining allowance or payment of a false
15          claim;
16                                          ***
            (h) is a beneficiary of an inadvertent submission of a false claim and,
17          after discovering the falsity of the claim, fails to disclose the falsity to
            the state or political subdivision within a reasonable time.
18

19     306.    In addition, Nev. Rev. Stat. § 422.560 prohibits the solicitation, acceptance or receipt

20  of anything of value in connection with the provision of medical goods or services for which payment

21

22  may be made in whole or in part under the Nevada Medicaid program.

23     307.    Defendants violated Nev. Rev. Stat. § 357.040(1) and knowingly caused  false claims

24  to be made, used and presented to the State of Nevada  by its deliberate and systematic violation of

25  federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that

26  none of the claims submitted in connection with its conduct were even eligible for reimbursement by

27  the government-funded healthcare programs.

28

308.   The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

309.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

310.   Had the State of Nevada known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

311.   As a result of Defendants' violation of Nev. Rev. Stat. § 357.040(1) the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

312.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Nev. Rev. Stat. § 357.080(1) on behalf of themselves and the State of Nevada.

313.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Nevada:

(1)   Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;
(2)   A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to Nev. Rev. Stat. § 357.210 and/or any other applicable provision of law;
(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)   An award of reasonable attorneys' fees and costs; and
(4)   Such further relief as this Court deems equitable and just.


## COUNT XVII
## THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS ACT

314.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 127 above as if fully set forth herein.

315.   This is a *qui tam* action brought by Relators on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care False Claims Law, N.H. Rev. Stat. Ann §167:61-b *et seq.*:

316.   New Hampshire Health Care False Claims Law, N.H. Rev Stat. Ann §167:61-b *et seq.* provides:

317.   Any person shall be liable who...

(a)   knowingly presents, or causes to be presented, to an officer or employee of the department a false or fraudulent claim for payment or approval;
(b)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department;
(c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid...

\*\*\*

 (f) Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim

318. In addition, N.H. Rev. Stat. Ann. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Hampshire Medicaid program.

319. Defendants violated the N.H. Rev. Stat. Ann by engaging in the conduct described herein.

320. Defendants furthermore violated N.H. Rev. Stat. Ann. § 167:61-b, and knowingly caused false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the New Hampshire Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

321. The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

322. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with Defendants' conduct. Compliance with applicable New Hampshire statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

---

FALSE CLAIMS ACT COMPLAINT

323.   Had the State of New Hampshire known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

324.   As a result of Defendants' violation of N.H. Rev. Stat. Ann. § 167:61-b *et seq.*, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

325.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev. Stat. Ann. § 167:61-b *et seq.* on behalf of themselves and the State of New Hampshire.

326.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of New Hampshire:

(1)   Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Hampshire;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b *et seq.* and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;